**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:** ______________________________

ERUDITE INCORPORATED,

Plaintiff,

v.

ARCADIA MANUFACTURING GROUP, INC., MIKE WERNER, DALE ROBERTS and WILLIAM T. SUMNER, individually,

Defendants.

______________________________/

# COMPLAINT

Plaintiff, ERUDITE INCORPORATED,(hereafter referred to as ERUDITE) files this its Complaint against ARCADIA MANUFACTURING GROUP, (hereinafter referred to AMG) MIKE WERNER, DALE ROBERTS, AND WILLIAM SUMNER, (hereinafter referred to as AMG Defendants )as follows:

## PARTIES

1. Plaintiff, ERUDITE, is a Washington corporation with its principal place of business in Tacoma, Washington. ERUDITE's President and Chief Executive Officer resides in and conducts ERUDITE's business from his office in Boca Raton, Florida.

2. Defendant, AMG is located in Greene Island, New York.

3. The INDIVIDUAL AMG Defendants are either officers, members of the AMG Board of Directors, AMG Engineers, and/or full time employees of AMG and have acted as

agents and/or representatives for this entity in the State of New York, as well as utilizing the mail and internet wires to further their criminal conspiracy against ERUDITE. Moreover, the AMG Defendants have executed and prepared documents on behalf of AMG, directly related to the fraudulent conduct, as well as the design, building, and testing of the prototypes of cargo container initially agreed by them to produce for ERUDITE, and have utilized both the mails and wires to further their criminal conspiracy. The AMG Defendants have marketed their deceit, executed documents related to their fraud (including proposals, statement of work and contracts transmitted to ERUDITE and related to the Project), participated in the development of the scheme, arranged for the transmission of documents via mail and wire to further their criminal conspiracy directly related to the project, both to Robert Mooney, President and Chief Executive Officer of ERUDITE at his place of business in Boca Raton, Florida, as well as to other ERUDITE officers, employees, and Board of Director Members at their place of business, and acted in various other non-legal related roles for AMG concerning ERUDITE'S Project, including but not limited to intentional misrepresentations concerning progress of work, orders placed with named sub-contractors, expenditure of ERUDITE'S funds, and misappropriation of same as well as progress to date, of ERUDITE'S project.

4. Defendant, Mike Werner is President of AMG and conducts business with Erudite from his office in Greene Island, New York.

5. Defendant, Dale Roberts, is an engineer who is an employee of AMG, and conducts business with ERUDITE from his office in Greene Island, New York.

6. Defendant, William Sumner is the Chief Executive Officer of AMG and conducts business with ERUDITE from his office in Greene Island, New York.

**JURISDICTION AND VENUE**

7. This court has original jurisdiction over this civil RICO action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a). This court may exercise supplemental jurisdiction over all state law claims stated herein, pursuant to 28 U.S.C. § 1367, as all claims are directly related and inextricably intertwined.

8. Venue is proper in this district under 18 U.S.C. § 1965(a) and/or 28 U.S.C. § 1391.

9. This court has personal jurisdiction over each of the Defendants. Each Defendant has committed a tort in whole or in part,or otherwise transacted business, in the State of Florida.

10. In connection with the wrongful conduct complained of herein, Defendants employed the means and instruments of interstate commerce, including the United States mails and wires.

11. All conditions precedent to the filing of this action have occurred, been performed, been waived or are otherwise excused.

**FACTUAL BACKGROUND**

12. Plaintiff, ERUDITE, is a corporation engaged in the design and construction and sale of various containers to be used by the United States Armed Forces for the transport of valuable materials and supplies needed by the Armed Forces to protect and supply the members of the Armed Forces.

13. Plaintiff, ERUDITE, is the owner of various registered United States patents, including patents for cargo containers, to be utilized for defense purposes by the Armed Forces.

14. ERUDITE first corresponded with representatives of AMG in January, 2010 to discuss its project with them and to solicit bids for the construction of the containers.

15. On March 17, 2010, Dale Hedricks, Director of Product Design for ERUDITE, and Major General Joe Simeone, Vice President of ERUDITE, met with representatives of AMG to begin negotiations for the construction of ERUDITE's container.

16. Defendant AMG was retained by ERUDITE on April 19, 2010, and entered into a Contract Proposal consisting of three Phases, i.e.,

i. Verification of the current design structural integrity;

ii. The prototype manufacture of three units of each size; and

iii. The testing of the Erudite cargo platforms under actual load conditions.

**The specifics of Phase One: Design Verification consisted of the following:**

The objective of Phase one is to identify any necessary design changes or improvements that can be captured prior to the first build, to provide the fastest track to successful prototype development.

Requirements would be that the customer designs would be used by Arcadia to perform FEA structural analysis per Mil Spec 209K. This would predict the reaction of the platforms to anticipated G-loads in three directions and would model the forces resulting from stacked containers. The report will include all relevant images and stress contour plots, assumptions, observations and recommendations.

Based on model structural results, AMG will consult with Erudite's design team and suggest design changes. The design changes would be focused on two areas. The first is identifying areas that would need to be strengthened to meet load criteria. The second would be to identify opportunities to reduce the weight of structural members and still remain within the performance parameters.

The time frame for the completion of the initial FEA study is two weeks from the signing of this contract. The cost of the initial model is $10,500, to be paid upon delivery. This cost includes a second iteration of the study to reflect the impact of any design changes. Further iterations of the design study that may be required will be at a cost of $2,500, each.

Upon finalization of the design and approval by Erudite, Arcadia will immediately begin manufacturing engineering for prototype production of the units. The cost of the manufacturing engineering will be $28,500 to be billed as incurred.

**The Specifics of Phase Two: Prototype Build consisted of the following:**

The results of Phase Two will be the assembly of three EAC-80 containers and three EAC-40 containers. They will be suitable for physical load testing. Two of the units of each size will be built less paint and electronics for the purpose of physical destructive testing.

The lead time to build will be dependent upon several factors related to the availability of materials. The longest lead time will be for the extrusion dies, which are 8 – 12 weeks delivery from the date of extrusion design approval. The costs of the extrusion dies will be a separate charge of approximately $15,000. We are currently waiting for confirmation of this cost from Kaiser Metals.

The cost of the building of the six prototypes if $75,000. These are two large material expenses for the prototype build. The larges portion of the cost of the materials is the extrusions from Kaiser Metals, including the extrusions dies. The other is the purchase of the wall materials. Due to this large material cost, Arcadia will require a 50% deposit prior to the ordering of materials, with the balance due upon completion of the units.

Arcadia is committed to a successful result of the prototype build and in our desire to partner with Erudite, we forgoing our normal setup charges and absorbing the major portion of the labor cost for the prototype build in exchange, Arcadia is to be awarded the exclusive rights to produce the Erudite cargo platforms as sole manufacturer.

**The Specifics of Phase Three: Destructive Testing consisted of the following:**

Arcadia will design and perform destructive testing to meet the requirements of Mil Spec 209K. The destructive tests result will include video imaging and load verification to documents failure modes. This data will be used to confirm the validity of FEA design assumptions.

Upon completion of the destructive testing, Arcadia will review the result with Erudite's design team for final validation of the design. The approved design will be stamped and approved by a NYS licensed PE. The approved design will be submitted to Defense Transportation System certification.

WORK LOCATION:

Design activities will be performed by Arcadia Manufacturing at their facility or by their designated contract engineers. Design review with Erudite representative will take place at a mutually convenient location. The prototype build and assembly will be done at the Arcadia facility at 90 Cahoes Avenue, Green Island, NY. The site of the destructive testing is TBD.

ADDITIONAL REQUIREMENTS:

We are currently waiting on Kaiser Metals for quotes for the extrusions dies for the prototype build. Further detail will be forwarded upon Arcadia's receipt of this information.

17. This Contract was executed by all parties, and more particularly executed by Michael Werner, President of AMG on April 19, 2010.

18. On May 12, 2010, the Defendants agreed to design, build and test six prototypes of cargo containers utilizing the patent owned by ERUDITE, as well as ERUDITE'S design, or in the alternative, build six prototypes to meet the improved design based on AMG recommendations, in exchange for payment in excess of $125,000, and the guarantee that should either or the prototypes be successful, AMG would be the recipient of a contract for the construction of an additional 500 containers in accordance with either of the initial prototypes.

**a. The two different prototypes were described in Scenario One and Scenario Two contained within the May 12, 2010 agreement.**

**Scenario One:** The total cost, as reflected by AMG was $158,371, which cost included Aluminum Extrusions, Aluminum Extrusions Die, Walls – to be bought- Engineering Charge, Production labor, Jig and Fixtures, Destructive Testing and Freight. It was anticipated that the total weight for each Scenario

One container would be 2,089 lbs, and the price included (1) three- EAC 80 All-Modal Cargo Containers; (2) three- EAC 40 All-Modal Cargo Containers, (3) FEA (two iterations); (4) Manufacturing Process Engineering; and (5) Tooling Engineering. AMG also specified that cost of Aluminum was for a minimum buy of material per extrusion die; Units will be Dumb – with no electronics; doors and hardware were not included; weight of built prototype as designed EAC-80 will be 2,089 lbs., and these numbers were based on Erudite contracting to AMG for a minimum of 500 unit production run.

**Scenario Two:** The total cost of Scenario Two, as reflected by AMG was $143,151, which cost included Aluminum Extrusions, Aluminum Extrusion Die, Wall (AMG Build), Engineering Charge, Design Change, Manufacturing Engineering, FEA, Production Labor, Jig and Fixtures, Destructive Testing, and Freight, The total Weight for each container would be 1,496 Lbs, and the price included (1) Three – EAC 80 ALL-Modal Cargo Containers; (2) Three – EAC-40 ALL-Modal Cargo Containers; (3) Design Engineering (AMG Recommendations); (4) FEA (two Iterations); (5) Manufacturing Process Engineering; and (6) Tooling Engineering. AMG also specified that Aluminum Cost is for a minimum Buy of Material per extrusion Die, Units will be Dumb with no electronics, Door and Hardware was not included and Weight of Built Prototype as Proposed EAC 80 would be 1,496 lbs. These numbers were based on Erudite contracting to AMG for a minimum 500 unit production run.

19. On Thursday, June 3, 2010, Robert Mooney traveled to Albany, New York and met with Michael Werner, Dale Roberts and William Sumner at AMG's facility in New York, in an attempt to finalize the ERUDITE project. At that time, and subsequent thereto, Mr. Mooney advised AMG, through William Sumner, that he would meet with the ERUDITE Board of Directors on June 13, 2010, advise the Board of his meeting with AMG on June 3, 2010 and inform AMG of the Board's decision as to whether or not to proceed with AMG with respect to the Project.

20. On June 15th, 2010, Mr. Mooney was informed via e-mail from Michael Werner, pursuant to their telephone conversation of the same date that:

> The engineering component related to the design improvements will be required consultation between AMG engineering team and Erudite representatives. Erudite's representative and AMG's design engineer will sign off on the changes when approved. We have included costs to facilitate three iterations to the design prior to performing FEA testing. In the event of fundamental design transformation that will require substantial additional time, related design costs will be presented to Erudite prior to being performed.
>
> Destructive testing will be performed by AMG. Based on our current understanding of the parameters of the required testing, AMG intends to absorb the cost of destructive testing. The parameters of testing need to e reviewed with Erudite and need to include the specifics required by the MIL-STD-209K. We will also need to identify the requirements of the particular DOD command that the results will be submitted to for approval.
>
> Paint is included in the pricing on both the beta and the production run. AMG needs a copy of the Power coat spec.
>
> AMG understands that the left side door is possibly going to be made from aluminum. AMG will absorb the cost.

21. Mr. Mooney again traveled to Boston, Massachusetts, to meet with the AMG defendants, as well as a corporate representative of SecuriTech, the proposed supplier of the container lock. During that meeting, after the SecuriTech representative left, Defendants Dale Roberts and Michael Werner advised that AMG would and could purchase all of the locks, "off the shelf" for the ERUDITE container at a cost of less than $200.00 per lock, and indicated that no engineering was necessary to supply same. In fact Mr. Roberts advised that AMG would and could purchase the lock ready to install.

22. Then, on July 8, 2010, Defendant, Dale Roberts on behalf of AMG, via e-mail to Robert Mooney, provided ERUDITE with a July 7, 2010 Statement of Work describing the scope of work that Arcadia Manufacturing Group of Green Island, NY will perform in design, development and prototype activities for ERUDITE, as follows:

- AMG will develop the concept design for Erudite All-modal Containers (EAC) models EAC-40 and EAC-80.
- The design activities will include design evaluation for eight, cost and manufacturability.
- The design modifications will be approved by Erudite, Inc.
- The resulting design configuration will be validated by Finite Element Analysis (FEA).
- Phototypes will be built to the approved designs by AMG.
- AMG will purchase all materials and extrusion dies required and design and build production fixtures.
- AMG will supply production labor to fabricate and assemble the containers, less right door and electronics as noted.
- AMG will deliver three prototype units of each model, EAC-40 and EAC-80. One of each model will be produced less powder coat for destructive testing.
- Erudite agrees to place anticipated production order with AMG for a minimum of 500 units.

23. In his July 8, 2010 e-mail, Mr. Roberts informed Mr. Mooney, as well as ERUDITE Board of Director member and Vice President, Joe Simeone, that AMG had been progressing with the design process, and was working on sub-structure improvements that would give additional strength and reduce weight. AMG was doing stress analysis on the individual improvements to identify the best results. AMG then had a plan on rolling up the rest results into a complete assembly to then validate by FEA.

Mr. Roberts went on to inform Mr. Mooney that AMG was validating the results from Datum 3D, an engineering design and analysis firm previously engaged by ERUDITE, on the deck options. Mr. Roberts claimed that AMG's review of Datrum 3D's FEA concluded that some of the failure points identified by Datum 3D may have been false and there may be a usable design with the lash rings attached to the deck. He stated that AMG will update Mr. Mooney on the results.

Mr. Roberts attached a spreadsheet that AMG will be using to track the progress on the EAC project, and advised that all can feel free to add to the list and e-mail additions to him. Mr. Roberts advised he would consolidate them and distribute updates to all. He also advised that there are some items that the joint team needed to address.

He thought it might be helpful to schedule a meeting within the next 2 week with Joe (Simeone) and John (Anderson, Chairman of ERUDITE) to discuss details of the structure, and advised that the best days for him are Monday thru Wednesday. He asked everyone to let him know what would work for them.

24. On August 10, 2010, after having not received a response to his attempt to schedule a meeting with AMG's engineers, Mr. Mooney wrote to AMG's engineers and officers, and reminded them that on Sunday he dispatched an e-mail to them which addressed a meeting of engineers/designers who have input to the final design of ERUDITE's container. He reminded them that he supplied two dates for them to choose in an attempt for Mr. Mooney to make the most equitable choice of the date to have the meeting on as well as the meeting's location. After having failed to receive a response, he informed all addressees that if they felt that their company did not want to participate in the build then this is the time to opt out and NOT attend. By not responding Mr. Mooney informed them that he will take their moot position as a decision not to participate in this project.

He went on to inform all that those who have submitted a Statement of Work (hereinafter referred to as "SOW") with a payment schedule will be given the scheduled payment at the meeting AFTER they have signed their copy of the SOW and ERUDITE has done the same. He pointed out to all that they are now on the clock for the build out for the first 8 containers and

that the first units for the crush test will not have any electronics. He asked each recipient to remain on schedule, and advised of the future meetings and conference calls.

A meeting was then scheduled with AMG's Mike Werner and Dale Roberts for Wednesday, August 25, 2010 to discuss AMG's progress with respect to the ERUDITE project. ERUDITE reserved a meeting room at the Marriott for the meeting.

25. Via e-mail to Michael Werner dated October 13, 2010, Robert Mooney informed Mr. Werner of a conversation he had just had with potential purchasers of the containers, regarding delivery. Mr. Werner was informed that these containers had to be delivered by the early part of January, 2011, and that in the event of no delivery, and no testing, there would be no containers ordered by customers of ERUDITE. He informed Mr. Werner that he could not be any more pointed than that.

Mr. Mooney reminded Mr. Werner that ERUDITE has performed all of their responsibilities on time and has left the chore for the FEA to AMG. Mr. Mooney went on to inform Mr. Werner of the impact of not meeting the schedule presented to ERUDITE by AMG and that it must be clearly understood that no one on ERUDITE's team will misrepresent a time schedule or any other deliverable that ERUDITE has promised or will promise. Mr. Mooney reminded Mr. Werner, once again, that he had pointed out to both Mr. Werner and Mr. Roberts just how critical the delivery schedule was during every conversation he had with either of them.

26. On November 29, 2010 both Dale Hedrick and Robert Mooney received an e-mail from Rob Turner of Delta Metrics, a subcontractor on the project, informing both that they had completed a loading test, under laboratory conditions, of all 4 load cells. He went on to inform both that when the time is appropriate, he would like to accompany the load cells to AMG and assist with the first installation and calibration. He stated that he would wait for Dale R.

(presumably Dale Roberts) about when we can schedule the load cell installation and calibration for the first base.

27. On December 2, 2010 during a conference telephone call with Michael Werner, both Mr. Mooney and Major General Joseph Simeone, Vice President of Operations for ERUDITE confirmed that Dale Roberts of AMG would assume the responsibility to coordinate the right hand door components as well as to update the status matrix. He was to coordinate with component suppliers, such as GlobalTrak and Delta Metrics. If any of the components failed to integrate with the unit than Dale Roberts would research and replace the failed component with a replacement. Each component had to be compatible with AMG's design of the right door and base.

28. AMG was given and assumed the responsibility for manufacturing 10 EAC units and the first two units would be available for crush testing.. Additionally one EACH 40" unit would be available for demo by January 15, 2011 for the ERUDITE Stockholders meeting in Grand Prairie, Canada.

29. On or about December 6, 2010, Mr. Mooney again spoke with both Michael Werner and Dale Roberts to discuss the project's progress. At that time both Michael Werner and Dale Roberts misrepresented the status of the project in that they advised Mr. Mooney that AMG was moving along once again toward the finish and was in fact making progress, knowing full well that all necessary materials, despite having been paid for by ERUDITE, had not even been ordered and that the construction of the containers had not even begun.

30. On December 7, 2010 Mr. Mooney received an e-mail from Michael Werner advising that he believed every one should do what is best for the success of the project, and

confirming that Dale Roberts was going to find someone to do the electronic testing on the design of the container.

31. Mr. Werner also confirmed that AMG would build the right hand door, unpopulated except for the lock and handle.

32. On December 13, 2010 Rob Turner advised Dales Roberts of AMG that the first Load Cell system which has already been paid for by ERUDITE should ship that week to AMG. Dale Roberts was to send Rob Turner a "no-charge" (zero dollar) purchase order so Delta Metrics could keep track of it from a paperwork standpoint. Mr. Turner also advised that he intended to travel to AMG when they were ready to install the first system to help with the setup and answer any questions that may arise. He also attached a quote for the next batch of load cells that were to be installed in the EAC's going out into the field for testing, and questioned whether ERUDITE was ok with either sending Delta Metrics a purchase order or a check before the end of this week as they would need either to start production on the Load Cells during the following week in order to be able to deliver before the end of January.

33. At no time did Dale Roberts inform either ERUDITE or Delta Metrics that they had never even started production of the cargo containers.

34. On December 20, 2010, representatives of ERUDITE met with Dale Roberts of AMG, as well as a representative of GlobalTrak, and Delta Matriks to discuss the progress of the project and to once again stress the importance of the proposed crush test and demonstration for the up and coming ERUDITE board of directors meeting.

35. On December 29, 2010, Mr. Mooney received an e-mail from Mr. Werner with an attached SOW. Mr. Werner advised that he want to make sure that Mr. Mooney understood that the proposal of December 28, 2010 was not about cost overruns. He pointed out to Mr. Mooney

that in the original SOW the right door was not part of the package and then went on to misrepresent that AMG "will complete the build of the first four of each container less the right door in budget. " To date, AMG has not completed the build of any of the containers contracted for by ERUDITE.

36. In the same e-mail AMG misrepresented the state of affairs with ERUDITE and provided another SOW, with an "unexpected cost". AMG attempted to charge ERUDITE for an additional $100,000 for the right hand door, when in fact, the charge for the entire project was originally $143,151. AMG complained about the expected build of the right door for the container, when the only addition expected by ERUDITE to the container was not the alleged addition of electronics to the right door, as stated by AMG, but AMG being informed that the left door, as designed, could be "flipped" and then installed as the right door so as to be utilized for the crush test. AMG knew that no electronics would be needed for the crush test. However, despite this knowledge and information, AMG desired to perform the engineering services at "N/C" as long as they could bill and secure additional funds from ERUDITE for Dale Roberts' time for engineering cost and project management. In order to justify this additional charge, Mr. Werner claimed that the costs of the build of the right door are hard costs that are not able to be mitigated, when in fact this is a total fabrication, as previously explained. Additionally, as there were no additional charges for Dale Roberts' time for engineering the right hand door, this too was a total fabrication and an attempt to further defraud money from ERUDITE.

37. Just as important, in the last paragraph of this e-mail, Mr. Werner acknowledges that ERUDITE owns and will be the primary beneficiary of this development, yet at the current time, AMG has failed to perform under the contract, has placed ERUDITE's funding from investors in jeopardy as some of the investors have backed out of the deal, after being informed

that AMG has not yet built the prototype as promised. ERUDITE is not only in jeopardy of losing investors in the project but is also in jeopardy of losing a contract from the Armed Forced, due to the many delays encountered by AMG's failure to perform. AMG has ignored all demands for the return of all of ERUDITE's C.A.D.'s, extrusions, dies, tools, drawings, engineering documents and designs, as well as all work done for and paid for by ERUDITE, currently in the possession and control of AMG, despite their acknowledgement that this is ERUDITE's property.

38. AMG has billed ERUDITE as follows:

| **Week** | **Purpose** | **Amount** | **Invoices** |
|---|---|---|---|
| 1 | AMG engineering & FEA | $24,300 | #72836 dated 8/31/10 |
| 9 | Kaiser Die Charge 50% | 13,200 | #72836 dated 8/31/10 |
| 9 | AMG MFG Fixture 50% | 14,250 | #74073 dated 10/26/10 |
| 18 | Kaiser Die Charge Balance | 13,200 | #74932 dated 11/30/10 |
| 18 | Kaiser Extrusions | 30,571 | #72836 dated 8/31/10<br>#74932 dated 11/30/10 |
| 18 | Wall Materials | 9,575 | #74932 dated 11/30/10 |
| 24 | AMG Mfg Fixtures Balance | 14,250 | #74073 dated 10/26/10 |
| 24 | Production Labor | 23,800 | #74963 dated 11/30/10 |
| **TOTAL** | | **143,151** | |

39. ERUDITE was intentionally misled by the AMG Defendants as to the progress of ERUDITE'S Project as the project has yet to be completed and not one container has been built by AMG.

40. AMG has provided false and misleading invoices in an attempt to conceal the theft of ERUDITE'S investment. The Project has yet to be completed, and in fact, it was not until Mr. Mooney, and Major General Joe Simeone went to AMG on January 11, 2011, and had a meeting with Michael Werner and Dale Roberts, that ERUDITE learned for the first time, that AMG had never built the first container for ERUDITE, and had literally nothing to show them. ERUDITE later learned that funds transferred to AMG for payment of materials ordered from a subcontractor were in fact never ordered from the subcontractor, and the materials were never received by AMG.

41. Since January 11, 2011, ERUDITE has determined that the subcontractors for which ERUDITE advanced funds to AMG to pay for necessary materials were never ordered by AMG nor were the materials purchased by AMG, and the funds have simply disappeared.

42. To date ERUDITE has paid AMG the total amount of ONE HUNDRED TEN THOUSAND EIGHT HUNDRED THIRTEEN ($110,813.00) DOLLARS, for the building of the prototype containers as described above, and to date, nothing in accordance with the Statement of Work has been completed by AMG.

43. Despite requests for same, AMG has failed to honor ERUDITE'S request for the return of all dies, tools, drawings, prototypes, and other materials ERUDITE has paid for, and all requests have been ignored. AMG has failed to return any of the monies paid by ERUDITE under false pretenses.

**COUNT ONE**

**CIVIL RICO PREDICATED UPON MAIL AND WIRE FRAUD PURSUANT TO 18 U.S.C. 1964**
(Against all Defendants)

44. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43, above, as though fully set forth herein.

45. This is a cause of action for Civil Rico predicated upon mail and wire fraud against all Defendants in this action, pursuant to 18 U.S.C. 1964.

46. Defendants intentionally participated in this scheme to defraud Plaintiff of both money and property, as set forth above.

47. Defendants carried out the scheme by means of material misrepresentations regarding the Project, its development, and the aforementioned monies paid for the development of the contracted for containers as well as use of the monies paid to Defendants.

48. Defendants' scheme and misrepresentations were conducted on an ongoing basis with Plaintiff from approximately May, 2010 and continuing through the present time, both through oral representations and promises, through various documents and through the use of e-mails. The AMG Defendants also provided written documents requesting the payment of monies to AMG for the development of ERUDITE's project knowing full well that the monies received from ERUDITE would not be used for their intended purpose.

49. The AMG Defendants used both the United States mails and United States wires to effectuate the scheme. The AMG Defendants used the mails to send Project-related information, receive monies from Plaintiff, and to aid in the inducement of the scheme for the purpose of extracting monies from ERUDITE under false pretenses and converting these funds to other unintended uses.

50. The AMG Defendants made extensive use of the United States wires in connection with the scheme in several ways, including but not limited to: telephonic conversations with Plaintiff's representatives in which misrepresentations were made; travel arrangements were made, the use of U. S. Mail was used for the transfer and receipt of the monies paid by Plaintiff; and the representations made through e-mail correspondence, as part of Defendants' continued scheme to defraud.

51. Plaintiff reasonably relied on Defendants' misrepresentations.

52. Plaintiff relied on the AMG Defendants' misrepresentations just as any reasonable corporation would have. The misrepresentations were supported by the information that was published in marketing materials as well as documentation which was either e-mailed or posted in the U. S. Mail to Plaintiff. In addition, the representations contained a number of promises and representations that would have induced a reasonable corporation to hire and to "invest" monies to facilitate the completion of the Project.

53. Despite Plaintiff's representatives repeated inquiries of all Defendants, Defendants, Michael Werner, Dale Roberts, and William Sumner, individually and on behalf of AMG, intentionally mislead and misrepresented the progress of the project, which lead Plaintiff's representative to misinform ERUDITE's board of directors and investors as to the progress of the project.

54. As a consequence of this reliance, Plaintiff has suffered injury and damages in the amount in excess of $50,000, the jurisdictional limit of this court, has suffered losses in investments from investors, has potentially lost orders for the containers at issue, has had its reputation in the defense industry damaged by AMG's failure to perform, has lost future profits, exclusive of interest and attorneys' fees and costs.

55. Plaintiff has retained undersigned counsel and is obligated to pay its attorneys a reasonable fee. Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to recover its attorneys' fees from Defendants in this action.

56. Defendants' actions are so intentional and deliberate so as to shock one's conscience and punitive damages are being sought.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in its favor as follows:

a. As to Defendant AMG, compensatory damages for the loss of a sum in excess of $50,000, invested in the Defendant company, together with treble damages, interest, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

b. As to Defendants Michael Werner, Dales Roberts and William Sumner, compensatory damages in excess of $50,000, compensatory damages for the loss of all future profits which would have been received by Plaintiff from the sale of the containers, together with treble damages and/or punitive damages, interest, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

## COUNT TWO

## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, SECTION 501.204 OF THE FLORIDA STATUTES

(Against all Defendants)

57. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

58. This is an action for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") against all AMG Defendants, pursuant to Section 501.204, Florida Statutes.

59. Plaintiff is a consumer under the definition of the statute. Defendants engaged in a series of deceptive acts and unfair trade practices by deceiving Plaintiff into investing in the Project under the pretext of several misrepresentations such as the time for the completion of the Project, and the timing surrounding the realization of the financial (and other) benefits, as well as use of the funds paid Defendant, AMG by Plaintiff.

60. The AMG Defendants made verbal misrepresentations, authorized by AMG, and provided ERUDITE with marketing materials, and directed ERUDITE to the internet website. By publishing the marketing materials and other papers, referring ERUDITE to Defendant AMG's website, and making both the verbal and written misrepresentations, Defendants engaged in deceptive and/or unfair practices, all with the intention of defrauding Plaintiff out of funds in excess of $100,000.

61. Defendants' acts caused Plaintiff to invest in the Project and, as a result, Plaintiff suffered damages in the form of the monies invested in the Project, which Defendants misappropriated. Plaintiff also suffered loss of business reputation, loss of financial investments from investors, loss of prospective orders for the containers, together with loss of profits and interest.

62. Plaintiff has retained undersigned counsel and is obligated to pay its attorneys a reasonable fee. Pursuant to FDUPTA, Plaintiff is entitled to recover its attorneys' fees from Defendants in this action.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in his favor as follows:

a. As to Defendant, AMG, compensatory damages for the loss of the monies invested, future lost profits, together with interest, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

b. As to Defendants, Michael Werner, Dale Roberts, and William Sumner compensatory damages for the loss of the monies misappropriated after same was invested with AMG, future lost profits, punitive damages, together with interest, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

## COUNT THREE

## FRAUD
## (Against all Defendants)

63. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

64. This is a cause of action for fraud against all Defendants.

65. The AMG Defendants, in inducing Plaintiff to invest in the Project, made several intentional misstatements and omissions regarding material facts, including but not limited to:

a. Misstatements as to the real completion time for the prototype containers they had contracted to build. These statements were false because Defendants knew the prototypes were not going to be built as promised or in the time frame offered. Thus, Defendants, knowing of the falsity of the statements, and the damage it would cause to Plaintiff, disregarded this and made the statements to Plaintiff's representatives with the intention of inducing Plaintiff to invest its funds in their company under false pretenses.

b. Misstatements as to the cost of the prototype containers. These statements made both in the materials provided to Plaintiff and in the oral and e-mail communications

between Defendants and Plaintiff's representatives were false, as Defendants never intended to complete the production of the prototypes for the contract amount, thus Defendants stopped all work on the prototypes with full knowledge of the damage it would cause Plaintiff.

c. Misstatements as to the information contained on Defendant's invoices as the material listed as having been purchased from a sub-contractor, in fact was not purchased and the monies for which Defendant sought a refund for were in fact never purchased or ordered. Clearly, Defendants never intended to complete the Project as promised, or in the timeframes represented to Plaintiff.

66. Michael Werner, along with the other AMG defendants, verified the misrepresentations made by AMG, and the other individual Defendants, and also misrepresented the completion time, monies paid by AMG to subcontractors for which reimbursement was sought, and orders provided to a sub-contractor for necessary materials, as well as the task for which AMG contracted with ERUDITE for.

67. The AMG Defendants made the statements and misrepresentations described above, on an ongoing basis, with scienter as they knew of their falsity and nonetheless made the representations to Plaintiff with the intent to induce it to invest in the building of the prototype containers with AMG. Plaintiff justifiably relied on those statements and misrepresentations of the AMG Defendants.

68. On inquiry, Plaintiff was continually reassured by each of the AMG Defendants as to the cost, date of delivery, and progress of the building of the prototype container, and had no means of determining that all representations made to it were false.

69. Plaintiff's justified reliance on Defendants' statements directly resulted in damages in the form of the monies invested for the project, which Defendants misappropriated,

together with loss of profits and interest, damage to business reputation, loss of orders, and loss of investment monies.

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in his favor as follows:

a. As to Defendant Michael Werner, compensatory damages for the loss of the monies paid to AMG in excess of $50,000, together with lost profits, with interest, punitive damages, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

b. As to Defendants Dale Roberts, William Sumner and AMG, compensatory damages for the monies paid to AMG in excess of $ 50,000, together with lost profits, interest, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

## COUNT FOUR

## COMMON LAW NEGLIGENCE
(Against all Defendants)

70. Plaintiff re-asserts the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

71. This is a common law negligence action against Defendants, AMG, Michael Werner, Dale Roberts, and William Sumner, who owed Plaintiff a duty of reasonable care in the building the prototype container within the time frame scheduled by Defendants and for the price set forth by Defendants.

72. Defendants breached that duty by causing Plaintiff to invest in excess of $50,000 in the building of the prototype containers by AMG for future sale to the Armed Forces by Plaintiff, when they knew they were not equipped to build them for the price agreed upon within the time frame agreed to.

73. As a consequence of Defendant's breach of this duty, Plaintiff was injured in that it invested large sums of money with Defendant, AMG, based on the misrepresentations of AMG, through the e-mails, and written documentation provided by Dale Roberts, Michael Werner and William Sumner, and further failed to pursue other avenues for the manufacture, design and construction of the prototype containers, thereby suffering damages in the form of the monies invested in the Project, some of which Defendants misappropriated, together with loss of profits, loss of business reputation, loss of investors, loss of sales, interest, and expenses.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in his favor as follows:

a. As to AMG, compensatory damages for the loss of the monies in excess of $50,000 paid to Defendant, AMG, together with interest, lost revenues from loss of investors, loss of sales, out of pocket expenses, costs and any other relief the Court deems just and proper.

b. As to Defendants Michael Werner, Dale Roberts, and William Sumner, compensatory damages for the loss of the monies paid to AMG, in excess of $50,000 , together with interest, loss of business reputations, lost revenues from the loss of investors, lost sales, costs, out of pocket expenses, and any other relief the Court deems just and proper.

## COUNT FIVE

## CIVIL CONSPIRACY
(Against all Defendants)

74. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

75. This is an action for civil conspiracy against all Defendants.

76. Defendants conspired with each other to defraud Plaintiff of money.

77. The AMG Defendants committed a number of overt acts in furtherance of the conspiracy including, but not limited to: making misrepresentations, both verbally, in writing and through materials provided to Plaintiff, causing Plaintiff to enter into agreements and to provide the AMG Defendants with large sums of money; the AMG Defendants have denied Plaintiff access to documents and materials which it has paid for and refuses, despite requests for the return of same, to return these material to Plaintiff in a timely fashion. Defendants have misrepresented to Plaintiff the status of the prototype Project to prevent it from discovering the fraud perpetrated on it; and acted in concert with one another to continue the concealment of their fraudulent conduct.

78. As a direct and proximate result of Defendants' actions, Plaintiff suffered injuries in the form of damages totaling in excess of $50,000, which represents the monies paid to AMG, and which Defendants misappropriated, loss of future profits, lost revenue from investors, loss of sales, out of pocket expenses, and interest.

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in his favor as follows:

a. As to Defendant, AMG, compensatory damages for the loss of the monies invested in excess of $50,000, together with interest, lost profits, lost revenues from investors, lost sales, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

b. As to Defendants Michael Werner, Dale Roberts and William Sumner, compensatory damages for the loss of the sum which exceeds $50,000, paid to AMG, together with interest, punitive damages, lost profits, lost revenue, reasonable attorneys' fees, costs and any other relief this Court may deem just and proper.

**COUNT SIX**

**CONVERSION**
(As to Defendant, AMG)

79. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

80. This is an action for conversion against Defendant, AMG.

81. After entering into an agreement (Statement of Work) with AMG for the building of the prototype containers, as set forth above with more specificity, Plaintiff received invoices requesting payment in the total amount of $143,151, as outlined above.

82. Plaintiff paid Defendant, AMG the total sum of $110,813 in scheduled and agreed upon payments, to be utilized for the purchase of materials from subcontractors and for the design and construction of prototype cargo containers.

83. That Plaintiff has come to learn that the funds billed by and paid to AMG for the purchase of materials from subcontractors were in fact never ordered from subcontractors and the remainder of the funds paid to AMG for the design and construction of the prototype containers was never used by AMG for the design and/or building of the containers, but instead were diverted by AMG for its own use, without the consent of Plaintiff.

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in its favor as follows:

As to Defendant, AMG, compensatory damages for the loss of the monies invested in excess of $50,000, together with interest, lost profits, lost revenues from investors, lost sales, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

**COUNT SEVEN**

**CIVIL THEFT**
(As to Defendant, AMG)

84. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

85. After entering into an agreement (Statement of Work) with AMG for the building of the prototype containers, as set forth above with more specificity, Plaintiff received invoices requesting payment in the total amount of $143,151, as outlined above.

86. Plaintiff paid Defendant, AMG the total sum of $110,813 in scheduled and agreed upon payments, to be utilized for the purchase of materials from subcontractors and for the design and construction of prototype cargo containers.

87. That Plaintiff has come to learn that AMG misrepresented that the funds billed by and paid to AMG for the purchase of materials from subcontractors and for the design and construction of the prototype containers, were in fact never ordered from subcontractors, and the remainder of the funds paid to AMG for the design and construction of the prototype containers was never used by AMG for the design and/or building of the containers Instead these funds were diverted by AMG for its own use, without the consent of Plaintiff.

88. Plaintiff has made demand upon Defendant, AMG, through its authorized representatives for the return of these monies to no avail.

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in his favor as follows:

As to Defendant, AMG, compensatory damages for the loss of the monies invested in excess of $50,000, together with interest, lost profits, lost revenues from investors, lost sales, punitive damages, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

**COUNT EIGHT**

**BREACH OF CONTRACT**
(As to Defendant, AMG)

89. Plaintiff re-asserts and realleges the allegations set forth in paragraphs 1 through 43 as though fully set forth herein.

90. This is an action for breach of contract against Defendant, AMG.

91. Defendant, AMG, through its agents and representatives drafted and executed Statements of Work with Plaintiff, ERUDITE, INC., setting forth the responsibilities of AMG for the design and construction of prototype cargo containers for use by the United States Armed Forces.

92. After entering into an agreement (Statement of Work) with AMG for the building of the prototype containers, as set forth above with more specificity, Plaintiff received invoices requesting payment in the total amount of $143,151, as outlined above.

93. Plaintiff paid Defendant, AMG the total sum of $110,813 in scheduled and agreed upon payments, to be utilized for the purchase of materials from subcontractors and for the design and construction of prototype cargo containers.

94. That Plaintiff has come to learn that AMG misrepresented that the funds billed by and paid to AMG for the purchase of materials from subcontractors and for the design and construction of the prototype containers, were in fact never ordered from subcontractors, and the remainder of the funds paid to AMG for the design and construction of the prototype containers

was never used by AMG for the design and/or building of the containers Instead these funds were diverted by AMG for its own use, without the consent of Plaintiff.

95. Defendant breached the contract between the parties further in that it failed to build the contracted for prototype containers in any fashion, despite having received payment for same.

96. Plaintiff has made demand upon Defendant, AMG, through its authorized representatives for the return of these monies to no avail.

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in his favor as follows:

As to Defendant, AMG, compensatory damages for the loss of the monies invested in excess of $50,000, together with interest, lost profits, lost revenues from investors, lost sales, reasonable attorneys' fees, costs and any other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable.

**DATED** this 2nd day of February, 2011.

LEWIS, STROUD & DEUTSCH, P. L.
Attorneys for Plaintiff
1900 Glades Road
Suite 251
Boca Raton, Florida 33431
Telephone: (561) 826-2800
Facsimile: (561) 826-2828

By: */s/ Harriet R. Lewis*
HARRIET R. LEWIS
Fla. Bar No.: 331015
Email: hlewis@lsdlaw.net